Heather M. Lopez (SBN 354022)
**MILBERG PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel: (331) 240-3015
Email: hlopez@milberg.com

Britany A. Wessan*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (708) 529-5418
britany@almeidalawgroup.com

**pro hac vice*
[additional counsel on signature page]

*Counsel for Plaintiff and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**NATALIE GIANNE**, *individually, and on behalf of all others similarly situated,*

Plaintiff,

v.

**TP-LINK SYSTEMS, INC.**

Defendant.

Case No.: 2:26-cv-01818

**FIRST AMENDED CLASS ACTION COMPLAINT**

1. **VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2510, *et seq.*;**
2. **VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT ("CIPA"), CAL. PEN. CODE § 631, *et seq.*;**
3. **VIOLATION OF CONSUMERS LEGAL REMEDIES ACT ("CLRA"), CAL. CIV. CODE § 1750, *et seq.*;**

4. **VIOLATION OF CAL. CONST. ART. 1 § 1;**
5. **INTRUSION UPON SECLUSION; and**
6. **UNJUST ENRICHMENT**

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Natalie Gianne ("Plaintiff"), individually and on behalf of all others similarly situated, brings this First Amended Class Action Complaint against Defendant TP-Link Systems, Inc. ("TP-Link" or "Defendant") and alleges as follows based upon personal knowledge as to her own actions and experiences, and upon information and belief, including investigation by counsel, as to all matters:

## NATURE OF THE ACTION

1. In an era where life is increasingly digital, a family's router is the digital front door to its most private affairs. Every day, millions of Americans rely on TP-Link's website, routers, mesh systems, smart-home cameras, and related devices and applications to connect their homes and businesses to the internet. Through its website, devices, and the software that controls them, users transmit and receive private communications, web browsing activity, camera footage, device controls, financial transactions, and other private data, all with the reasonable expectation that their identities and online activities will remain secure and confidential.

2. TP-Link's data collection occurs in a number of ways, including through: (1) Tracking Technologies embedded in TP-Link's consumer-facing Websites that intercept users' browsing communications in real time; (2) software development kits and tracking code embedded in TP-Link's mobile applications, including the Tether app that is required to set up and manage TP-Link's router extenders, that collect Wi-Fi network credentials, precise geolocation data, MAC addresses, and device log files from within consumers' homes; and (3) firmware code embedded directly in TP-Link's networking hardware that transmits users' DNS queries, browsing activity, and Internet usage patterns to third-party servers. This firmware-level surveillance occurs from

within a device installed in the consumer's home, creating meaningfully more intimate intrusion than observing a user's visit to a public website.[1]

3. Consumers do not expect that the gateway to their private lives will secretly intercept, monetize, and transmit their data to technology conglomerates subject to the authority of a foreign adversary, specifically, the People's Republic of China ("PRC" or "China"). Yet that is precisely what TP-Link has done, in violation of federal and state law.

4. TP-Link is one of the largest consumer networking companies in the world and the dominant player in the United States market, controlling approximately 65% of the United States market for networking devices and generating billions of dollars in annual revenue.[2]

5. TP-Link holds itself out as an American company headquartered in Irvine, California. But in reality, TP-Link has a supply chain deeply entrenched in China, where consumer data is accessible and nearly all of the components used in TP-Link's devices are sourced.

6. Through its primary website, tp-link.com and its consumer-facing websites www.tp-link.com, www.kasasmart.com, and www.tapo.com (collectively, the "Websites"); its mobile applications, including Tether, Tapo, Kasa, and Deco (collectively, the "Applications"); and the firmware embedded in its networking hardware (the "Devices")—TP-Link intercepts and collects detailed information regarding users' browsing activity, device usage, network metadata, home network architecture, Wi-Fi credentials, DNS queries, and persistent identifiers. TP-Link

---

[1] *See* Sayan Sen, *Beware: TP-Link routers apparently sending customer data to Avira without user consent*, Neowin (Mar. 12, 2022), https://www.neowin.net/news/beware-tp-link-routers-apparently-sending-customer-data-to-avira-without-user-consent/; Guenni, *Beware: User reports TP-Link routers share traffic with third parties (Avira)*, BornCity (Mar. 14, 2022), https://perma.cc/J9BH-YSCW. *See also* TP-Link Privacy Policy, https://perma.cc/Z7KM-8T8R (confirming collection of "device log files and configurations, including Wi-Fi credentials").

[2] https://www.tp-link.com/us/about/about-us/

further assigns and utilizes digital identifiers capable of tracking individuals across websites, applications, and devices, and transmits the foregoing data to third-party entities.

7. At massive scale and without meaningful notice or valid consent, TP-Link transmits and makes accessible Americans' personal information to third-party advertising and analytics entities. These practices violate federal regulations, wiretapping statutes, state privacy laws, and common-law protections.

8. TP-Link has cultivated a public narrative designed to obscure its Chinese origins and continuing connections. Founded in 1996 in Shenzhen, China by brothers Zhao Jiaxing ("Cliff Chao") and Zhao Jianjun ("Jeffrey Chao"), TP-Link expanded into the United States in 2008.

9. After more than a decade of commercial success, TP-Link announced a purported corporate restructuring. By 2024, Cliff Chao retained control over TP-Link's Chinese operations through TP-LINK Technologies Co., Ltd., while Jeffrey Chao became CEO and owner of TP-Link Systems Inc. The supposed separation is illusory. On information and belief, operational, financial, and technological integration between the entities continues, allowing both operations access to consumer data.

10. In April 2025, the federal government implemented the Bulk Sensitive Data Transfer Rule ("BSDR" or "DOJ Rule"), codified at 28 C.F.R. Part 202, which prohibits the commercial transfer of Americans' bulk sensitive personal data, including IP addresses, advertising identifiers, cookie data, and other persistent online identifiers to entities subject to the jurisdiction of countries of concern, including China. The Rule reflects the government's determination that such transfers pose an "unusual and extraordinary threat" to the national security of the United States.[3]

---

[3] Justice Department Implements Critical National Security Program to Protect Americans' Sensitive Data from Foreign Adversaries, U.S. DOJ (Apr. 11, 2025), *available at* https://www.justice.gov/opa/pr/justice-department-implements-critical-

11. The gravity of TP-Link's misconduct is further underscored by the accelerating government enforcement actions against the company. In December 2025, the Federal Trade Commission announced an investigation into whether TP-Link deceived consumers about its connections to China.[4] The Florida Attorney General issued an investigative subpoena to TP-Link over cybersecurity risks. Members of Congress have called on the Department of Commerce to investigate, with the Chairman of the House Select Committee on the Chinese Communist Party warning that TP-Link's "unusual degree of vulnerabilities and required compliance with Chinese law are in and of themselves disconcerting" and that "[w]hen combined with the PRC government's use of routers like TP-Link to perpetrate extensive cyberattacks in the United States, it becomes significantly alarming."[5]

12. State officials have likewise acted. Recognizing the grave threat to consumers, on January 26, 2026, Texas Governor Greg Abbott, in consultation with Texas Cyber Command, updated the Texas Prohibited Technologies List to include TP-Link, prohibiting the use of TP-Link hardware on all state-owned devices and networks.[6] On February 17, 2026, the Texas Attorney General filed suit against TP-Link, alleging that TP-Link devices are "modern weapons of war, enabling a foreign adversary to surveil and attack the United States" and that TP-Link has created "a web

---

national-security-program-protect-americans-sensitive (last visited Feb. 16, 2026, internal quotation omitted).

[4] FTC examines whether TP-Link misled US consumers about its China split, source says, https://www.reuters.com/world/china/ftc-examines-whether-tp-link-misled-us-consumers-about-its-china-split-source-2025-12-04/; *see also* Letter from Chairman John Moolenaar & Ranking Member Raja Krishnamoorthi, H. Select Comm. on the Strategic Competition Between the U.S. and the Chinese Communist Party, to Sec'y of Commerce Gina Raimondo (Aug. 13, 2024), https://perma.cc/T898-3RLD (last accessed Feb. 18, 2026).

[5] *See* n. 4 *supra.*

[6] *See* https://gov.texas.gov/news/post/governor-abbott-updates-texas-prohibited-technologies-list.

of deception" to conceal its Chinese affiliations.[7]

13. After Plaintiff's initial complaint was filed, the Federal Communications Commission issued a ban on foreign-made Wi-Fi routers, citing security issues.[8]

14. Rather than the secure digital doorway consumers expect, TP-Link's devices are an open window for Chinese-sponsored threat actors and Chinese intelligence agencies. On information and belief, TP-Link's Tracking Technologies, advertising integrations, data-sharing arrangements, and device telemetry practices violate the BSDR by transferring bulk U.S. sensitive personal data to covered persons, including entities organized under the laws of, or having their principal place of business in, China.

15. TP-Link intercepts users' electronic communications for the purpose of making these unlawful transfers and violating Americans' privacy, in violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511, *et seq.*, rendering TP-Link liable to every American whose communications it intercepted and whose data it transmitted to covered foreign persons. TP-Link's conduct independently violates the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631; the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; and Californians' constitutional right to privacy under Art. I, § 1 of the California Constitution.

16. Plaintiff seeks to hold TP-Link accountable for operating infrastructure that intercepts and, on information and belief, transfers Americans' sensitive online activity to entities subject to the jurisdiction of a designated foreign adversary. Plaintiff brings this Complaint on behalf of a Nationwide Class and a California

---

[7] *See* https://dir.texas.gov/information-security/covered-applications-and-prohibited-technologies.

[8] *See* http://nytimes.com/wirecutter/reviews/foreign-made-wi-fi-routers-ban/ ("The federal government reportedly considered banning the Irvine, California–based company from doing business in the US in 2025. But instead of narrowly focusing on TP-Link, the FCC has now banned all new foreign-made Wi-Fi routers.").

Subclass, seeking statutory and compensatory damages for the millions affected, as well as injunctive relief prohibiting TP-Link from continuing these unlawful practices.

## PARTIES

17. Plaintiff Natalie Gianne is and was at all relevant times, an individual and resident of the city of Los Angeles, California. Plaintiff intends to remain in California indefinitely.

18. Defendant TP-Link Systems, Inc. has its United States headquarters at 10 Mauchly, Irvine, CA 92618.

## JURISDICTION AND VENUE

19. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, specifically the ECPA, 18 U.S.C. § 2510 *et seq*.

20. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed classes consist of at least 100 members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one class member is a citizen of a state different from at least one Defendant. CAFA jurisdiction exists independently of, and does not depend upon, Plaintiff's federal ECPA claim.

21. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Plaintiff's federal claims under the ECPA.

22. This Court has personal jurisdiction over Defendant because TP-Link is headquartered in this District at 10 Mauchly, Irvine, California and conducts substantial and continuous business within this District.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant resides in this District and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. TP-Link's General Business

24. TP-Link was founded in 1996 in Shenzhen, China, by brothers Cliff Chao and Jeffrey Chao. The company expanded into the United States market in 2008 through the establishment of TP-Link USA. By 2016, its U.S. operations reported revenues exceeding $2 billion.

25. TP-Link's smartphone Applications are ranked as the top downloads in Apple's App Store Utilities category, and its sponsored Amazon listings show tens of thousands of monthly purchases.

26. TP-Link's business and revenue depend largely on its sale of Wi-Fi routers and other web-related devices in the United States.

27. On the Website, visitors can view TP-Link's products. On these pages, TP-Link provides links to third parties where users can purchase these products and, at relevant times, consumers could complete purchases directly through TP-Link's Website checkout flow, which is powered by Shopify's e-commerce platform.

### B. TP-Link's Corporate Structure and Chinese Ties

28. After more than a decade of operation, and facing increasing scrutiny over Chinese technology risks, TP-Link announced a 2024 corporate restructuring purportedly intended to signal a formal separation from its Chinese origins.

29. TP-Link represented that it had divided into two distinct, unaffiliated entities: Cliff Chao would retain control of the Chinese operations through TP-LINK Technologies Co., Ltd., while Jeffrey Chao would serve as CEO and owner of the U.S.-headquartered TP-Link Systems Inc. The company asserted that this separation "encompassed all shareholdings and operational aspects, including legal entities, workforce, research and development, production, marketing, and customer service."[9]

---

[9] TP-Link Corporation Group, *TP-Link Corporation Group Announces Completion of Corporate Restructuring, Marking a New Era in its Future Evolution* (May 11, 2024), https://perma.cc/S9QX-69SH (last accessed Feb. 18, 2026).

30. Government investigators dispute that narrative. For example, the Texas Attorney General alleges the restructuring constitutes a "web of deception" designed to obscure continuing Chinese control. Far from independent, TP-Link Systems Inc. remains deeply operationally, financially, and technologically intertwined with TP-LINK Technologies.

31. The operational unity between TP-Link Systems Inc. and its Chinese-affiliated entities is confirmed by prior shared leadership (and continued family ties), an integrated supply chain, and continuing financial and technological interdependence.

32. On information and belief, TP-Link Systems Inc. and TP-LINK Technologies Co., Ltd. share research and development resources, source code, firmware architecture, cloud infrastructure, and engineering personnel, and TP-Link Systems Inc. remains dependent on Chinese-affiliated entities—including Lianzhou Technologies Co., Ltd.—for the design, manufacture, and importation of the devices it sells in the United States.

33. TP-Link's representations that its products are "Made in Vietnam"



likewise obscure the reality of a China-centric supply chain.

34. TP-Link maintains operational control over at least four major facilities in China—including the Shenzhen Research and Development Center, Shenzhen Manufacturing Center, Dongguan Manufacturing Center, and Shenzhen Guangqiao Manufacturing Center—and is building a fifth engineering facility in Chengdu, China.[10]

35. Trade data confirms that as recently as January 2026, TP-Link has imported networking devices into the United States from its Chinese-affiliated company Lianzhou Technologies Co., Ltd., departing from Shanghai, China to Long Beach, California. Jeffrey Chao himself has acknowledged that TP-Link's Chinese facilities and subsidiaries have recently received state accolades and benefits from the Chinese government, including subsidies, tax breaks, and expedited permitting.[11]

36. A Chinese province recently announced that TP-Link's Vietnamese factory was one of its "Key Projects for Foreign Investment and Cooperation," and reports indicate a Chinese military company was working to expand TP-Link's manufacturing, research, and development facilities in Vietnam.[12]

37. Because of their ownership, control, and physical presence within China, TP-Link's Chinese entities are subject to Chinese national-security and intelligence laws, including the 2017 National Intelligence Law, the Cybersecurity Law, and the Data Security Law. These statutes compel organizations and citizens to support, assist,

---

[10] TP-Link, *2024 Sustainability Report*, https://static-page.tp-link.com/sustainability/pdf/TP-Link%202024%20Sustainability%20Report.pdf (last accessed Feb. 17, 2026).

[11] Kate O'Keeffe, *Wi-Fi Giant TP-Link's US Future Hinges on Its Claimed Split From China*, Bloomberg (Apr. 11, 2025), https://www.bloomberg.com/news/articles/2025-04-11/wi-fi-giant-tp-link-s-us-future-hinges-on-its-claimed-split-from-china (last accessed Feb. 18, 2026).

[12] Kate O'Keeffe, *Wi-Fi Giant's Vietnam Factory Raises Questions Over China Split*, Bloomberg (Nov. 22, 2025), https://www.bloomberg.com/news/articles/2025-11-22/wi-fi-giant-s-vietnam-factory-raises-questions-over-china-split (last accessed Feb. 18, 2026)

and cooperate with state intelligence work, creating a continuing legal pathway for Chinese government access to data handled by TP-Link's China-based operations.

38. Article 7 of the National Intelligence Law provides: "Any organization or citizen shall support, assist, and cooperate with state intelligence work in accordance with the law, and keep the secrets of national intelligence work." The cooperation these laws compel means that TP-Link could be legally prohibited from disclosing to American consumers that their data had been accessed.

39. Moreover, Chinese state-sponsored hacking groups have repeatedly exploited TP-Link Devices and routers to build botnets used to infiltrate United States critical infrastructure. In October 2024, Microsoft reported that a Chinese threat actor known as "Storm-0940" was utilizing compromised TP-Link routers to conduct password-spraying attacks against Microsoft 365 accounts.[13] Check Point Research separately identified a Chinese hacking group, "Camaro Dragon," that deployed malicious firmware implants specifically on TP-Link routers to target European government entities.[14] Former NSA Cybersecurity Director Rob Joyce testified before Congress that TP-Link routers were among the devices exploited by Chinese state-sponsored hackers in the massive Volt, Flax, and Salt Typhoon attacks.[15]

40. In April 2025, the Cybersecurity and Infrastructure Security Agency ("CISA") issued notice that an SQL injection vulnerability in TP-Link's firmware had been discovered, allowing unauthenticated attackers to inject malicious statements via

---

[13] *Chinese threat actor Storm-0940 uses credentials from password spray attacks from a covert network*, https://perma.cc/8369-TQXR (last accessed Feb. 18, 2026).

[14] *The Dragon Who Sold His Camaro: Analyzing Custom Router Implant* (May 16, 2023), https://perma.cc/Y3SM-T9A8 (last accessed Feb. 18, 2026).

[15] *Written Testimony of Rob Joyce, Former NSA Cybersecurity Director, Before the House Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party* (Mar. 5, 2025), https://docs.house.gov/meetings/ZS/ZS00/20250305/117983/HHRG-119-ZS00-Wstate-JoyceR-20250305.pdf (last accessed Feb. 18, 2026).

the username and password fields.[16] As former FCC Commissioner Michael O'Rielly warned, TP-Link's Chinese investment structure "warrants further inquiry" and its products had "more than their fair share of citations."[17]

41. U.S. agencies including have repeatedly warned—including in CISA advisory AA25-239A (2025)—that PRC-linked threat actors leverage vulnerabilities in edge routers and consumer networking devices to gain long-term access to networks across the telecommunications, government, and private sectors.[18]

42. Notwithstanding this history, TP-Link's marketing materials continue to promise comprehensive privacy and security. The company advertises that its HomeShield service "covers all security scenarios," "handles all your concerns" about cyber virus intrusions and IoT device attacks, and ensures that "your devices and personal information are well protected anytime and anywhere with antivirus, online threat protection, firewall, secure VPN client, and privacy monitor."[19] These assurances are false or misleading.

43. TP-Link's Tether, Tapo, Kasa, and Deco apps collect consumers' personal information, including email addresses, precise location, and mobile phone identifiers, while their privacy policies vaguely state when TP-Link may share information, including for personalized marketing "that does not directly identify you."[20]

---

[16] *SQL Injection vulnerability in TP-Link M7000 4G LTE Mobile Wi-Fi Router Firmware* (Apr. 16, 2025), https://strobes.co/vi/cve/CVE-2025-29652 (last accessed Feb. 18, 2026).

[17] Michael O'Rielly, *Chinese Wireless Routers: The Next Entry Point for State-Sponsored Hackers?*, Hudson Institute (Mar. 6, 2024), https://perma.cc/U73C-G233 (last accessed Feb. 18, 2026).

[18] Countering Chinese State-Sponsored Actors Compromise of Networks Worldwide to Feed Global Espionage System, https://www.cisa.gov/news-events/cybersecurity-advisories/aa25-239a.

[19] *Home Shield*, https://perma.cc/K42B-BRPF (last accessed Feb. 18, 2026).

[20] *Privacy Policy*, https://privacy.tp-link.com/web/official/privacy-policy? (last visited Feb. 18, 2026).

44. None of these policies disclose that TP-Link's Chinese affiliations subject American consumer data to potential access by TP-Link employees in China or PRC intelligence agencies under China's National Intelligence Law. This omission is designed to obtain uninformed consent, because full disclosure would deter consumers.

**C. DOJ Rule: The Bulk Sensitive Data Transfer Rule**

45. The BSDR originates in Executive Order 14117, in which the President determined that the transfer of Americans' bulk sensitive personal data to countries of concern—including China—poses a national security risk. The Order reflects a shift in federal policy recognizing that foreign adversaries may obtain sensitive information about U.S. persons not only through cyber intrusions or traditional espionage, but also through ordinary commercial data flows.

46. The Department of Justice implemented Executive Order 14117 through the Data Security Program, administered by the National Security Division and codified at 28 C.F.R. Part 202. DOJ has explained that the program is intended to prevent countries of concern from accessing Americans' bulk sensitive personal data through commercial practices, including data brokerage, advertising technology, and cross-border data sharing.

47. As a senior Justice Department official explained, the BSDR aims to stop foreign governments from sidestepping American cybersecurity protections entirely: "[W]hy would you go through the trouble of complicated cyber intrusions and theft to get Americans' data when you can just buy it on the open market or force a company under your jurisdiction to give you access? . . . The [BSDR program] makes getting that data a lot harder."[21]

---

[21] *See* Press Release, U.S. Dep't of Just., *Justice Department Implements Critical National Security Program to Protect Americans' Sensitive Data from Foreign Adversaries* (Apr. 11, 2025) (quoting Deputy Attorney General Todd Blanche), https://perma.cc/5XCZ-DWU7 (last accessed, Feb. 17, 2026).

48. At a high level, the BSDR prohibits "covered data transactions," defined as transactions that involve the transfer of bulk sensitive personal data to a "covered person" through specified transaction types, including "data brokerage." *See* 28 C.F.R. §§ 202.210, 202.301(a). Whether a given transfer is prohibited turns on what data is being transferred, to whom, in what volume, and through what type of transaction.

49. *Sensitive Personal Data and Covered Personal Identifiers.* The BSDR defines a set of "listed identifiers" that includes, among other items, device identifiers, IP addresses, and cookie data. *See* 28 C.F.R. § 202.234(g). A listed identifier becomes a "covered personal identifier," and therefore "sensitive personal data" regulated by the BSDR, when it is transferred in combination with any other listed identifier, or in combination with other data such that it is linked or linkable to other listed identifiers or to other sensitive personal data. *See* 28 C.F.R. §§ 202.212(a), 202.249(a).

50. *Bulk Thresholds.* The BSDR's prohibitions apply when sensitive personal data is transferred in "bulk." For covered personal identifiers, the rule defines bulk as data relating to 100,000 or more U.S. persons during a 12-month period. *See* 28 C.F.R. § 202.205(f). For precise geolocation data, the rule defines bulk as data relating to 1,000 or more U.S. persons during a 12-month period. *See* 28 C.F.R. § 202.205(c).

51. *Covered Persons.* The BSDR prohibits transfers when the recipient is a "covered person," defined as any foreign person that is at least 50% owned by, directly or indirectly, a country of concern. *See* 28 C.F.R. § 202.211(a). China is expressly designated as a country of concern.

52. *Access.* Access means "logical or physical access, including the ability to obtain, read, copy, decrypt, edit, divert, release, affect, alter the state of, or otherwise view or receive, in any form, including through information systems, information technology systems, cloud-computing platforms, networks, security systems, equipment, or software. For purposes of determining whether a transaction is a covered data transaction, access is determined without regard for the application

or effect of any security requirements." 28 C.F.R. § 202.201.

53. *Knowingly Directing*. The BSDR prohibits any U.S. person from knowingly directing any covered data transaction that would be a prohibited or restricted transaction if engaged in by a U.S. person. 28 C.F.R. § 202.305.

54. *Prohibitions and Penalties.* The BSDR provides for both civil and criminal penalties for violations, underscoring the national security significance of the rule. *See* 28 C.F.R. § 202.1301.

**D. TP-Link's use of Tracking Technologies in Violation of the BSDR**

55. TP-Link utilizes and previously utilized various tracking technologies on its Websites when users go to purchase devices to use in their homes. For purposes of this Complaint, the tracking technologies include the TikTok pixel, Meta Pixel, Google Analytics, LinkedIn, and CrazyEgg (collectively, the "Tracking Technologies").

56. The primary BSDR violation at issue concerns the transmission of bulk U.S. sensitive personal data to TP-Link's own Chinese-affiliated entities, subsidiaries, and facilities—namely TP-LINK Technologies Co., Ltd. and Lianzhou Technologies Co., Ltd.—through the Tracking Technologies and the Devices' firmware.

57. Each Tracking Technology executed code within the user's browser that reroutes the contents of the user's communications, together with persistent identifiers, to third-party servers in real time. Each transmission feeds the pool of user data that TP-Link makes available, on information and belief, to its Chinese-affiliated entities.

***i. TP-Link's Websites Deploy Numerous First- and Third-Party Tracking Technologies that Collect Bulk Sensitive Personal Data.***

58. When a user visits TP-Link's consumer-facing Websites, the pages deploy numerous first- and third-party tracking technologies that automatically measure, record, and transmit user data without adequate notice or meaningful consent. The screenshot below illustrates an example of a Tracking Technology

(Meta) capturing a unique identifier (the "fbp" parameter) in the Website's network traffic.

**Query String Parameters** View source View URL-encoded

| | |
|---|---|
| id | 467442490108030 |
| ev | SubscribedButtonClick |
| dl | https://www.tp-link.com/us/home-networking/smart-plug/tapo-p135-kit/ |
| rl | https://www.tp-link.com/us/home-networking/smart-plug/ |
| if | false |
| ts | 1771361570271 |
| cd[buttonFeatures] | {"classList":"tp-btn tp-btn-brand default-button ga-click tp-ada-mouseactivate tp-ada-highlight-focus","destination":"","id":"","imageUrl":"","innerText":"BUY NOW","numChildButtons":0,"tag":"a","type":null,"name":""} |
| cd[buttonText] | BUY NOW |
| cd[formFeatures] | [] |
| cd[pageFeatures] | {"title":"Tapo P135 KIT \| Smart Wi-Fi Lamp Dimmer Plug Kit \| TP-Link"} |
| cd[parameters] | [] |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.265 |
| r | stable |
| ec | 1 |
| o | 12318 |
| fbp | fb.1.1771359634722.826064132257097357 |
| eid | ob3_plugin-set_9a124d405d0e7cfd4bfa1521e0f57a2ec393bc99f5c8a4a968ebf7b1764f4808 |
| cs_est | true |
| ler | empty |
| cdl | API_unavailable |
| pmd[description] | Matter smart plug to dim and control lamps |
| plt | 275.89999997615814 |
| it | 1771361410345 |

59. These Tracking Technologies, including, but not limited to, web beacons, pixels, software development kits ("SDKs"), JavaScript tags, application programming interfaces ("APIs"), cookies, and other scripts—are small pieces of code that TP-Link intentionally integrated into its Websites to track user behavior and to transmit data to first- and third-party platforms.

60. TP-Link's own Cookie Policy acknowledges its use of "Cookies and online tracking technologies," including "Web Beacons/Gifs, Pixels, Page Tags, [and] Script," and confirms that "[e]mails and mobile apps may contain small transparent

image files or lines of code to record how you interact with them."[22]

61. Through Tracking Technologies, TP-Link collects bulk personal data from users of the Websites. This data includes persistent identifiers, such as IP addresses, advertising IDs, device IDs, and cookie data, and the full-page context, such as full-string URLs revealing the pages viewed, products browsed, and actions taken on the Websites. The combination of these persistent identifiers with full-string URLs, browsing sequences, and device metadata transmitted by the Tracking Technologies enables TP-Link and its third-party recipients—including its Chinese-affiliated entities—to deanonymize individual users, reconstruct detailed behavioral histories, and associate those histories with specific, identified persons across sessions and platforms. This data is linked and linkable to specific individuals and thus constitutes "covered personal identifiers" under 28 C.F.R. §§ 202.212(a), 202.249(a).[23]

***ii. TP-Link's Mobile Applications Collect Additional Sensitive Personal Data Through Embedded Tracking Technologies.***

62. Beyond its Websites, TP-Link operates a suite of mobile Applications, including TP-Link Tether, TP-Link Tapo, TP-Link Deco, and Kasa Smart, that are available on Apple's App Store and Google's Play Store. These Applications are frequently required to operate TP-Link Devices and grant consumers the ability to customize and control privacy and security settings for cameras, routers, fans, lights, and other smart-home devices.

63. TP-Link's Privacy Policy confirms that it collects, through its mobile

---

[22] *Cookie Policy*, https://privacy.tp-link.com/web/cookie/policy (last accessed Feb. 18, 2026).

[23] *See* Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*, 57 UCLA L. Rev. 1701, 1716–17 (2010) (demonstrating that combinations of persistent identifiers and behavioral data reliably re-identify individuals). *See also* Arvind Narayanan & Vitaly Shmatikoff, *Robust De-anonymization of Large Sparse Datasets*, 2008 IEEE Symp. on Security & Privacy 111 (2008).

Applications, data including: (i) the user's Internet Protocol (IP) address; (ii) MAC address; (iii) mobile device information including operating system and browser type; (iv) unique device identifiers, including identifiers used for advertising purposes; (v) access times and location; (vi) pages accessed and links clicked; and (vii) information about how users interact with the Sites and Services.

64. TP-Link's Cookie Policy further acknowledges that "[w]hen you use mobile applications, unique identifiers associated with your device (such as the device ID), your activity within the App and your network location may be recorded".[24]

65. The data collected through TP-Link's Applications is particularly sensitive because it reveals the internal architecture of consumers' private residences and home networks. When a consumer uses the Tether app to set up and configure TP-Link router extenders—as Plaintiff did—the Application collects: (i) Wi-Fi network names and passwords, which are the keys to the consumer's home network; (ii) MAC addresses of every device connected to that network, revealing the number, type, and configuration of connected devices in the home; (iii) precise geolocation data identifying the physical location of the consumer's home; (iv) device log files revealing when devices are active, when the home is occupied, and the behavioral patterns of household residents; and (v) network configuration data reflecting the security posture of the consumer's connected household. No reasonable consumer configuring a home Wi-Fi extender would expect that the device manufacturer is simultaneously transmitting this information to entities subject to the jurisdictional control of a foreign adversary.[25]

66. Further, when Plaintiff and California Purchaser Subclass members configured their TP-Link extenders through the Tether app, the application's onboarding flow presented only functional setup prompts, specifically, granting

---

[24] TP-Link Cookie Policy, https://privacy.tp-link.com/web/cookie/policy

[25] TP-Link Privacy Policy, https://perma.cc/Z7KM-8T8R. *See also* TP-Link Tether Privacy Policy (confirming collection of Wi-Fi network credentials during device setup).

location permission, connecting to the extender's default Wi-Fi, creating a local device management password, scanning for and selecting the host Wi-Fi network, entering the Wi-Fi password, and naming the extended network.[26]

67. TP-Link's own Tether Privacy Policy acknowledges that the app collects and processes "device identifier and credentials" when device binding is enabled, uses location access during "Repeater onboarding," and collects "device logs" and related device data when users report problems through the feedback function.[27]

68. The Privacy Policy further discloses that personal data may be transferred to and stored in countries "other than the country where you live," and that "data processed in another country may be subject to different laws and may be accessible to government, judicial, law enforcement, and regulatory agencies in those countries."[28]

69. TP-Link did not disclose cross-border data access or transfer risks, including the risk that data stored in or accessible from the People's Republic of China may be subject to compelled disclosure under PRC national security laws.[29]

---

[26] *See* TP-Link, *How to Configure Range Extender via Tether APP*, https://www.tp-link.com/us/support/faq/1373/ (last updated July 18, 2024) (depicting extender onboarding steps as: connect to extender default Wi-Fi, select host network, enter Wi-Fi password, name extended network — no consent checkbox or privacy notice appears at any step); *see also* TP-Link Community, *Tether — Initial Configuration*, https://community.tp-link.com/us/home/kb/detail/416 (same functional steps described with no reference to a privacy disclosure screen).

[27] TP-Link, *Tether Privacy Policy* §§ 2.1, 2.3, https://privacy.tp-link.com/app/Tether/privacy (last updated Nov. 25, 2024). The Privacy Policy is a general post-hoc disclosure located outside the onboarding flow; it does not constitute a consent mechanism contemporaneous with credential collection.

[28] *Id.* § 5.

[29] *See* Letter from Rep. John Moolenaar & Rep. Raja Krishnamoorthi, House Select Comm. on the Strategic Competition Between the U.S. and the Chinese Communist Party, to Sec'y of Commerce Gina Raimondo (Aug. 13, 2024), https://chinaselectcommittee.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/2024-08-13%20Letter%20to%20Commerce%20re%20TP-Link%20%28filed%29.pdf ("TP-

70. TP-Link's Privacy Policy also confirms that it collects "device log files and configurations, including Wi-Fi credentials" and the user's "location information". This data, when combined with persistent identifiers, constitutes covered personal identifiers under the BSDR.

***iii. TP-Link's Devices, Including Router Firmware Transmits User Data to Third-Party Servers Without Adequate Consent.***

71. Independent of its Websites and Application tracking, TP-Link's router firmware has been found to transmit user network traffic data to third-party servers without users' knowledge or meaningful consent.[30]

72. User reports and independent analysis have confirmed that TP-Link Devices and routers, including the Archer AX3000 and Deco X68 models, transmitted over 80,000 requests in a single 24-hour period to Avira SafeThings servers, even when the user had not subscribed to Avira's services and had all related HomeShield/HomeCare features disabled. Avira SafeThings is described as "a cloud-based behavioral threat intelligence platform which interfaces with a service provider's home router" and which "analyses user traffic."[31]

73. This transmission of network traffic data, which can include DNS queries, browsing activity, and other internet usage patterns, occurs without adequate disclosure and without the user's informed consent, and constitutes an additional vector through which TP-Link exposes Americans' behavioral data to third parties.

***iv. The Data Collected By TP-Link's Tracking Technologies Constitutes Bulk***

---

Link's unusual degree of vulnerabilities and required compliance with PRC law are in and of themselves disconcerting.").

[30] Sayan Sen, *Beware: TP-Link routers apparently sending customer data to Avira without user consent*, Neowin, (Mar. 12, 2022), https://www.neowin.net/news/beware-tp-link-routers-apparently-sending-customer-data-to-avira-without-user-consent/ (last accessed, Feb. 18, 2026).

[31] Guenni, *Beware: User reports TP-Link routers share traffic with third parties (Avira),* BornCity, (Mar. 14, 2022), https://borncity.com/win/2022/03/14/nutzerberichte-legen-nahe-dass-tp-link-router-traffic-mit-drittanbietern-avira-teilen/ (last accessed Feb. 18, 2026)

***U.S. Sensitive Personal Data Under The BSDR.***

74. The BSDR, codified at 28 C.F.R. Part 202, restricts or prohibits U.S. persons from engaging in covered data transactions with covered persons. "Covered personal identifiers" under the Rule include, *inter alia*: (i) device-based or hardware-based identifiers such as MAC addresses; (ii) advertising identifiers; (iii) network-based identifiers such as IP addresses or cookie data; and (iv) demographic or contact data.

75. The Tracking Technologies deployed by TP-Link initiate requests that result in the transmission of numerous protected "listed identifiers" under the BSDR, including but not limited to: IP addresses (28 C.F.R. § 202.234(g)); advertising IDs (28 C.F.R. § 202.234(e)); device IDs (28 C.F.R. § 202.234(c)); and cookie data (28 C.F.R. § 202.234(g)).

76. TP-Link transmits these protected identifiers together, including, for example, transmitting a given user's IP address along with the user's cookie data and advertising IDs, such that the identifiers are clearly linked with one another and are associated, or reasonably capable of being associated, with each related user.

77. This information qualifies as covered personal identifiers and sensitive personal data under the BSDR because these identifiers are shared (i) in combination with at least one other listed identifier, or (ii) in combination with other data such that the listed identifier is or can reasonably be associated with other listed identifiers or other sensitive personal data. *See* 28 C.F.R. §§ 202.212(a), 202.249(a).

78. On information and belief, TP-Link has collected or maintained this sensitive personal data relating to more than 100,000 U.S. persons following the effective date of the BSDR, and therefore this information constitutes bulk U.S. sensitive data under 28 C.F.R. § 202.206. Indeed, TP-Link controls approximately 65% of the United States market for consumer networking devices, and its websites

receive millions of unique U.S.-based visitors monthly.[32] Independently, and on information and belief, TP-Link has collected or maintained precise geolocation data, including through the Applications' collection of location data during device onboarding, relating to more than 1,000 U.S. persons during a 12-month period, and that data therefore constitutes bulk U.S. sensitive personal data under 28 C.F.R. § 202.205(c).

***v. TP-Link Knowingly Violates the BSDR by Enabling Data Flows to Covered Persons.***

79. Despite the BSDR's clear prohibitions, TP-Link, through its automated advertising infrastructure, tracking technologies, and associated databases, transmits or provides access to U.S. consumers' bulk sensitive personal data to entities and persons that qualify as covered persons under the BSDR, including its Chinese-affiliated parent entities, subsidiaries, and facilities.

80. TP-Link's Privacy Policy confirms that user information may be transferred to, or stored and processed in, locations where TP-Link "ha[s] infrastructure or data centers," and expressly states that "[y]our information will be transferred or transmitted to, or stored and processed in . . . other countries where our Partners, vendors, service providers and third parties are located outside of the country where you live". TP-Link acknowledges that "[t]hese countries may have different privacy standards that differ from where you are" and that "data processed in another country may be subject to different laws and may be accessible to government, judicial, law enforcement, and regulatory agencies in those countries".[33]

81. TP-Link's awareness of this legal risk is further reflected by the fact that the company has been the subject of, *inter alia*: (i) a December 2025 FTC

---

[32] Chris Morris, *Amazon's bestselling routers, which power internet in most U.S. homes, could soon be banned over national-security concerns,* Fortune, (Dec. 18, 2024), https://fortune.com/2024/12/18/tp-link-router-ban-national-security-china/ (last accessed Feb. 18, 2026).

[33] https://www.tp-link.com/us/about-us/privacy/

investigation for deceiving consumers by allegedly concealing its connections to China; (ii) Texas Governor Greg Abbott's January 2026 designation of TP-Link as a "prohibited technology" on all government devices and networks; and (iii) the February 2026 lawsuit filed by Texas Attorney General Ken Paxton alleging deceptive marketing and backdoor access to TP-Link products for the Chinese government.

***vi. TP-Link Does Not Obtain Valid Consent for Its Tracking Technologies.***

82. Despite the sensitivity of the data collected, TP-Link does not require users to validly consent to the operation of the Tracking Technologies.

83. As a result, Website and Application users' personal information, including persistent identifiers (e.g., cookie IDs, device IDs, mobile advertising IDs, and IP addresses), device metadata (e.g., screen resolution, browser version, operating system, and language settings), and contextual information such as full URLs and referring pages, are surreptitiously obtained by the Tracking Technologies.

84. Such user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics. Those in possession of this information can gain deep understanding of users' behavioral traits and characteristics.

85. Users who visit or make a purchase through any subdomain of the Website are not adequately notified that the Tracking Technologies are intercepting their interactions with the Website, including page views of specific items, cart additions, and purchases. Critically, the checkout flow on TP-Link's Websites presented Plaintiff and California Purchaser Subclass members with Shopify's standard terms of service at the point of purchase.[34]

---

[34] Shopify's default checkout configuration displays the merchant's own linked privacy policy in the checkout footer only if the merchant has properly configured those links in its store settings. *See* Shopify Help Center, *Adding Store Policies*, https://help.shopify.com/en/manual/checkout-settings/refund-privacy-tos. On information and belief, TP-Link's checkout page at the time of Plaintiff's purchase displayed only Shopify's standard terms of service and did not link to TP-Link's own Privacy Policy or Cookie Policy.

86. The absence of a meaningful consent mechanism at checkout is not cured by TP-Link's Cookie Policy or Privacy Policy, because those policies are independently defective as notice documents. TP-Link's Cookie Policy has vague descriptions of tracking, overly broad purposes, and categorizes numerous deployed cookies and tracking technologies with descriptions marked only as "Unknown."[35]

87. In the hands of a foreign adversary, the data intercepted by the Tracking Technologies can be used to build detailed dossiers on U.S. residents, identify psychological or financial vulnerabilities, and target individuals in sensitive roles, such as jurists, military personnel, journalists, politicians, or dissidents. This data can be weaponized for profiling, coercive targeting, or even blackmail, without the users' knowledge that their information is being transmitted to a foreign-controlled entity.

88. The data at issue is uniquely dangerous in the hands of an adversary because of what it reveals about the interior of American homes. From the full-string URLs of the product, support, and configuration pages a user visits, a recipient can infer the precise router or extender models installed in the user's home—including models with known, publicly catalogued firmware vulnerabilities—and the network configurations the user has implemented. Combined with device log files revealing when devices are active and geolocation data identifying where the home is located, this information permits a recipient to determine which households operate exploitable equipment, when those households are likely to be occupied, and how their networks are secured.

**<u>PLAINTIFF NATALIE GIANNE'S EXPERIENCE</u>**

89. In or around July 2025, Plaintiff Gianne visited TP-Link's Website, www.tp-link.com, to research and purchase Wi-Fi router extenders for use in her home.

90. During her Website visit, Plaintiff accessed and viewed specific product

[35] *Cookie Policy*, https://privacy.tp-link.com/web/cookie/policy (last accessed Feb. 18, 2026).

pages for TP-Link extender models, including product-configuration and specification pages that revealed to the Tracking Technologies the specific devices, price points, and network-performance features Plaintiff was evaluating for her home network.

91. The Tracking Technologies embedded in the Website intercepted and transmitted these browsing communications—including full-string URLs identifying the specific products viewed and the searches Plaintiff conducted—to third-party servers, including servers operated by Meta and Google, without Plaintiff's knowledge or consent.

92. Plaintiff Gianne currently owns three TP-Link Wi-Fi router extenders and uses these devices on a daily basis. In connection with her purchase and installation, Plaintiff accessed TP-Link's Websites to obtain information regarding installation, configuration, and operation of the extenders, including product support pages and setup guides. The full-string URLs of the specific support and configuration pages Plaintiff visited revealed to the Tracking Technologies the specific extender models she purchased, the specific network configurations she was implementing, and the security posture of her connected household.

93. Plaintiff suffered a concrete and particularized injury from TP-Link's conduct. Plaintiff's injury includes: (i) the actual, real-time interception and transmission of her specific browsing communications, home Wi-Fi credentials, device log files, and geolocation data to third parties, including entities subject to PRC intelligence-access obligations, without her knowledge or consent; (ii) the loss of control over private information, such as home network architecture and household occupancy patterns; (iii) the economic harm of having paid a price premium for security and privacy features that TP-Link falsely represented its products would provide; and (iv) the heightened, ongoing risk of surveillance, profiling, and coercive targeting arising from the transmission of her personal data to entities that are legally obligated to cooperate with PRC intelligence services upon demand. These are concrete, traceable to TP-Link's specific conduct, and redressable by the relief sought

herein.

94. Plaintiff would not have paid the purchase price—or purchased TP-Link's products had she known that (i) TP-Link's devices were subject to firmware vulnerabilities exploited by Chinese state-sponsored hackers; (ii) TP-Link's Chinese affiliations subject her data to compelled disclosure under PRC national intelligence laws; and (iii) TP-Link's tracking infrastructure would transmit her personal data to entities affiliated with a foreign adversary.[36]

## CLASS ACTION ALLEGATIONS

95. Plaintiff brings this action individually and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and a Class of others similarly situated, defined as follows (collectively, the "Class"):

> **Nationwide Class:** All individuals in the United States whose electronic communications with TP-Link's Websites or Applications were intercepted and whose data was transmitted to covered persons on or after April 8, 2025.
>
> **California Subclass**: All individuals who resided in California at the time their communications were intercepted.
>
> **California Purchaser Subclass**: All California residents who purchased TP-Link products or made purchases through TP-Link's Websites.

96. Excluded from the Class are: (a) Defendant and its officers, directors, employees, subsidiaries, parents, successors, predecessors, and affiliates; (b) the Judge presiding over this action and any member of the Judge's immediate family and staff; (c) any juror assigned to this case; and (d) Plaintiff's counsel and Defendant's

---

[36] *Home Shield*, https://perma.cc/K42B-BRPF (last accessed Feb. 18, 2026) (same source as existing ). *See also* TP-Link product pages reviewed by Plaintiff during her July 2025 Website visit, including product descriptions for TP-Link Wi-Fi Range Extenders incorporating HomeShield security marketing available at www.tp-link.com

counsel.

97. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

98. **Numerosity**: The exact number of Class members is unknown and not available to Plaintiff, but individual joinder is impracticable. On information and belief, Defendant has thousands of users who fall into the definition of the Class and Subclass. Class members can be identified through Defendant's records.

99. **Commonality and Predominance**: There are questions of law and fact common to the claims of Plaintiff and the alleged Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes members include, but are not necessarily limited to the following:

a. Whether Defendant used Tracking Technologies to cause users' web browsers to reroute electronic communications—including URLs, metadata, and behavioral activity;

b. Whether Defendant used a device, as defined under 18 U.S.C. § 2510(5), to intercept the contents of communications from Plaintiff and the Class;

c. Whether Defendant obtained valid consent from Plaintiff and the Class to aid in the interception and disclosure of their electronic communications to third parties, and to use such communications;

d. Whether the data transmitted by Defendant constitutes "bulk U.S. sensitive personal data" under the DOJ Rule;

e. Whether Defendant's transmission of data to its Chinese-controlled entities constitutes a prohibited or restricted transaction under the DOJ Rule;

f. Whether Defendant acted knowingly and with intent to share the information;

g. Whether Defendant's interception and disclosure of users'

communications fall within the crime-tort exception to the ECPA's party-consent provision;

h. Whether Defendant was unjustly enriched at the expense of the Class;

i. Whether Defendant's actions violate California laws invoked herein; and

j. Whether Plaintiff and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

100. Typicality: Plaintiff's claims are typical of the claims of members of the Class and Subclass. The claims arise from a common nucleus of operative fact—the surreptitious interception and illicit transfer of their personal information to a foreign adversary of the United States. Plaintiff, like all members of the Class, had her information unlawfully intercepted and has been injured by Defendant's misconduct at issue.

101. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class and Subclass. That is, Plaintiff and the members of the Classes sustained injuries and damages as a result of Defendant's conduct. Plaintiff also has no interests antagonistic to those of the Class or Subclass, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and have the financial resources to do so. Neither Plaintiff nor her counsel have any conflicts with or interests adverse to the Class or Subclass.

102. **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Classes is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this

Complaint as well as the risk of inconsistent adjudication. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Through a class action, economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

## <u>CAUSES OF ACTION</u>

### FIRST CAUSE OF ACTION
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. §2510, *et seq.*;
### *(On Behalf of Plaintiff and the Nationwide Class)*

103. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as fully set forth herein.

104. The ECPA prohibits "any person" from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

105. The ECPA also prohibits "any person" from "intentionally us[ing], or endeavor[ing] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(d).

106. 18 U.S.C. § 2520(a) provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of" 18 U.S.C. § 2511.

107. *Intentional Interception*: Defendant knowingly and intentionally programmed, deployed, and maintained the Tracking Technologies on its Websites for the purpose of rerouting user communications to Defendant's own servers and to the servers of third-party Tracking Technologies for Defendant's later use.

108. The Tracking Technologies intentionally capture the contents of users' interactions with the Websites and purposefully transmit them to Defendant's and the Tracking Technologies' servers.

109. The Tracking Technologies' code—including, but not limited to, JavaScript tags, cookies, web beacons, pixels, and software development kits provided by Google, Meta Platforms, Inc. (Facebook), TikTok (ByteDance Ltd.), Crazy Egg, Inc., LinkedIn (Microsoft Corporation), and others, executed automatically within Plaintiff's and Nationwide Class members' browsers during the page load process without Plaintiff's consent.

110. This code intercepted the contents of Plaintiff's and Nationwide Class members' interactions with the Websites by rerouting their communications, including but not limited to IP addresses, identifiers, full-string URLs, page titles, search queries, and the content of the pages viewed, to the Tracking Technologies. Additionally, firmware code embedded in TP-Link's Devices intercepted users' DNS queries, browsing activity, and Internet usage patterns originating from within their home networks and transmitted this data to third-party servers without users' knowledge or consent. These firmware-level interceptions occurred continuously and automatically as users operated their Devices in their homes, independent of any Website visit or Application interaction.

111. These interceptions occurred as part of the browsers' rendering of the Websites, before Plaintiff or members of the Nationwide Class could detect the transmissions or consent to the transmissions.

112. When Plaintiff and the Nationwide Class members navigate the Websites, the Tracking Technologies' code causes their browsers to transmit IP addresses, cookie IDs, device IDs, advertising IDs, full-string URLs, and related identifiers concerning Plaintiff and the Nationwide Class members in real time.

113. These transmissions occur without the users' awareness or adequate consent and are initiated automatically during the same browser session in which the user communicates with the Websites.

114. The Tracking Technologies' capture of these communications constitutes an unlawful interception under the ECPA. Defendant's subsequent use of these

communications constitutes an unlawful use under the ECPA.

115. *Contents of Communications — Website Tracking Technologies:* The data intercepted by the Tracking Technologies from Plaintiff and members of the Nationwide Class includes full-page URLs, including search queries and product pages viewed, and persistent identifiers. These qualify as the "contents" of a "communication" under 18 U.S.C. § 2510(8) because they reveal the substance and subject matter of the users' communications with the Websites—not merely that a communication occurred, but what the user was specifically seeking, researching, and considering. For example, a URL of the form https://www.tp-link.com/us/home-networking/range-extender/[model-number]/[configuration] discloses the specific device model, configuration, and technical specifications the user was evaluating at a particular moment—information that reveals the user's purchasing intent, home network architecture, and technological environment.

116. *Contents of Communications — Applications:* The communications intercepted through TP-Link's Applications similarly constitute "contents" under 18 U.S.C. § 2510(8). Wi-Fi network names and passwords submitted through the Tether app during extender setup reveal the identity of the user's home network and the means to access it—information that is communicative in substance. Device log files and network configuration data transmitted through the Applications reveal the user's home-occupancy patterns, the devices present in the household, and the user's behavioral routines. These communications disclose far more about the user's private life than a product browsing session and are not addressable as mere metadata.

117. *Contents of Communications — Device Firmware:* DNS queries transmitted through TP-Link's Device firmware constitute "contents" under 18 U.S.C. § 2510(8) because they reveal the specific websites and online services the user is attempting to access, thereby disclosing the subject matter and substance of the user's communications with the Internet from within their private home network. DNS queries are the functional equivalent of the queries users type into a search engine—

they reveal intent, interest, and behavior with specificity.

118. Full-string URLs transmitted by the Tracking Technologies reveal the specific products that Plaintiff browsed, the specific product pages Plaintiff viewed, and the searches that Plaintiff conducted on the Websites—disclosing not just that Plaintiff visited a networking-equipment retailer, but the particular devices, configurations, and technologies Plaintiff was researching and considering for purchase.

119. The intercepted URLs thus expose the specific products and topics Plaintiff was intentionally seeking out for purchase and review, information that, when aggregated with persistent identifiers, a reasonable person would not wish to be disclosed to unknown third parties, particularly to entities subject to the jurisdictional control of a foreign adversary.

120. *Devices:* The technologies the Tracking Technologies use to intercept this data, including but not necessarily limited to web beacons, pixels, software development kits, APIs, JavaScript, and cookies, constitute "device[s]" under 18 U.S.C. § 2510(5), which includes "any device or apparatus" used to intercept electronic communications.

121. The Websites did not provide clear or conspicuous notice that user interactions would be surveilled and routed to foreign entities, including China, and Plaintiff and Nationwide Class members lacked a reasonable means to detect, prevent, or opt out of the Tracking Technologies' data collection and sharing.

122. TP-Link's Privacy Policy, while disclosing in general terms that it uses "cookies" and may share data with "authorized partners" and "service providers," does not disclose the specific Tracking Technologies deployed, the identity of each third-party recipient, the scope of data intercepted, or the fact that user data is transmitted to entities subject to the jurisdictional control of China, a country of concern under the BSDR.

123. TP-Link's Cookie Policy, while listing certain cookies, fails to disclose

the full nature, purpose, or destination of the data collected by many of the listed cookies.

124. The party exception in 18 U.S.C. § 2511(2)(d) does not apply. At the time of each interception, the Tracking Technologies' interception, and Defendant's use, of these communications was undertaken knowingly and intentionally for the purpose of committing multiple independent criminal and tortious acts, namely: (i) the unlawful transmission of bulk U.S. sensitive personal data to a covered foreign entity in violation of the BSDR, 28 C.F.R. Part 202, a federal regulatory offense subject to penalties under 28 C.F.R. § 202.1301; (ii) the violation of Plaintiff's and the Nationwide Class members' right to privacy under the California Constitution, Art. I, § 1, a tortious act; and (iii) the commission of the common-law tort of intrusion upon seclusion through the creation and dissemination of detailed behavioral profiles derived from intercepted communications. Because each of these purposes is independently tortious or criminal, the interceptions were undertaken for tortious and criminal purposes within the meaning of § 2511(2)(d), and the party exception is unavailable to Defendant.

125. On or after April 8, 2025, Defendant knowingly engaged in prohibited or restricted data transactions with its Chinese-affiliated parent entities, subsidiaries, and facilities—including but not limited to TP-LINK Technologies Co., Ltd. and Lianzhou Technologies Co., Ltd., entities organized under the laws of, and having their principal places of business in, China, without the requisite security requirements, in violation of the BSDR. 28 C.F.R. §§ 202.301, 202.401.

126. Defendant additionally deployed multiple Tracking Technologies on the Websites that transmit user behavioral and device-level data in real time to third-party platforms, including TikTok, Meta, Google, LinkedIn, and CrazyEgg.

127. TP-Link Systems Inc. is a corporation organized under the laws of the State of California, with its U.S.-based headquarters in Irvine, California. Because Defendant is organized under the laws of the United States and is an entity in the

United States, Defendant is a "U.S. person" under 28 C.F.R. § 202.256.

128. In addition, TP-Link's U.S.-based officers and employees, including its CEO Jeffrey Chao and its executives, managers, and engineers are each "U.S. persons" under 28 C.F.R. § 202.256. Acting within the scope of their employment and under Defendant's control, these individuals knowingly directed the deployment and maintenance of the Tracking Technologies on the Websites, the data-collection functions of the Applications, and the telemetry functions of the Devices' firmware, and thereby knowingly directed covered data transactions with covered persons.

129. TP-LINK Technologies Co., Ltd. and Lianzhou Technologies Co., Ltd. qualify as "covered persons" under 28 C.F.R. § 202.211(a) because they are entities organized or chartered under the laws of, or having their principal places of business in China, a "country of concern" under the BSDR. 28 C.F.R. §§ 202.208, 202.601.

130. TP-Link's Tracking Technologies initiate requests that result in the transmission of numerous protected "listed identifiers" under the BSDR, including but not limited to: IP addresses (28 C.F.R. § 202.234(g)); advertising IDs (28 C.F.R. § 202.234(e)); device IDs (28 C.F.R. § 202.234(c)); and cookie data (28 C.F.R. § 202.234(g)).

131. TP-Link transmits these protected identifiers together, including, for example, transmitting a given user's IP address along with the user's cookie data and advertising IDs, such that the identifiers are clearly linked with one another and are associated, or reasonably capable of being associated, with each related user.

132. This information qualifies as "covered personal identifiers" and "sensitive personal data" under the BSDR because these identifiers are shared (1) in combination with at least one other listed identifier, or (2) in combination with other data such that the listed identifier is or can reasonably be associated with other listed identifiers or other sensitive personal data. *See* 28 C.F.R. §§ 202.212(a), 202.249(a).

133. On information and belief, TP-Link has collected or maintained this sensitive personal data relating to more than 100,000 U.S. persons, including Plaintiff

and the putative Class members, following the effective date of the BSDR, and therefore this information constitutes "bulk U.S. sensitive data" under 28 C.F.R. § 202.206. TP-Link controls approximately 65% of the United States market for consumer networking devices.

134. TP-Link is aware of the BSDR and its requirements. TP-Link has been the subject of, *inter alia*: (i) a national security investigation by the U.S. government concerning its ties to China; (ii) Texas Governor Greg Abbott's January 2026 designation of TP-Link as a "prohibited technology" on all state-owned devices and networks; and (iii) the February 2026 lawsuit filed by Texas Attorney General Ken Paxton alleging TP-Link deceived consumers about its Chinese affiliations and the security risks posed by its devices.

135. TP-Link knew or reasonably should have known that it had engaged and was engaging in covered data transactions involving data brokerage in violation of the BSDR. TP-Link knowingly engaged and engages in covered data transactions with covered persons, and TP-Link has violated the BSDR's prohibition of data-brokerage transactions under 28 C.F.R. § 202.301 and/or of engaging in restricted transactions without the requisite security controls under 28 C.F.R. § 202.401.

136. In addition to Defendant's tortious and criminal intent to violate the BSDR by sharing certain information with entities subject to the jurisdictional control of China, as described further below, the interceptions by the Tracking Technologies were also knowingly and intentionally performed for the independent purpose of committing tortious acts in violation of state common law, specifically:

a. Violating Plaintiff's and the Class members' right to privacy through the creation and dissemination of highly detailed identity profiles, enriched by the contents of Plaintiff's and the Class members' communications intercepted by the Tracking Technologies, as described herein; and

b. Committing the tort of intrusion upon seclusion by using the contents of the intercepted communications to facilitate the creation of highly

detailed identity profiles on Plaintiff and Class members, which were then used and disseminated as described herein.

137. Since the Tracking Technologies intentionally and knowingly intercepted and disclosed data, and Defendant intentionally and knowingly used Plaintiff's and Class members' communications for the purpose of committing these criminal and tortious acts, Defendant is not shielded by the party exception under the ECPA.

138. Plaintiff and the Class suffered harm as a result of Defendant's violations of the ECPA, including the transmission of their sensitive data to entities affiliated with a foreign adversary identified by the United States as a threat to national security, the invasion of their privacy, and the loss of control over how and where their browsing behavior was used and shared.

139. Plaintiff seeks preliminary, equitable, and declaratory relief as may be appropriate; the sum of the actual damages suffered and the disgorgement of profits obtained by Defendant as a result of its unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(c)(2), whichever is greater; punitive damages; and reasonable costs and attorneys' fees.

## SECOND CAUSE OF ACTION
**Violation Of California Invasion Of Privacy Act,**
**Cal. Pen. Code §631, *et seq.*;**
***(On Behalf of Plaintiff and the California Subclass)***

140. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as fully set forth herein.

141. CIPA is codified at Cal. Penal Code §§ 630–638.

142. CIPA begins with its statement of purpose: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping on private communications and the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal

liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

143. California Penal Code § 631(a) provides, in relevant part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)."

144. A defendant must show it had the consent of "all parties to the communication" in order to avoid liability under CIPA § 631.

145. At all relevant times, Plaintiff and the California Subclass members communicated with Defendant's Websites, including https://www.tp-link.com, https://www.kasasmart.com, and https://www.tapo.com, by exchanging electronic communications over the Internet. These communications include Plaintiff's and Class members' HTTP requests, URL queries, search inputs, browsing interactions, and associated data transmissions that occur when a user visits and navigates the Websites.

146. These communications were transmitted from Plaintiff's and the California Subclass members' computing and mobile devices, which were located in the State of California, to Defendant's servers. These communications constitute "message[s], report[s], or communication[s]" transmitted over a "wire, line, or cable" within the meaning of Cal. Penal Code § 631(a).

147. Defendant aided, agreed with, employed, and conspired with third

parties, including Google, Meta Platforms, Inc., TikTok, Crazy Egg, Inc., LinkedIn, and others to track and intercept Plaintiff's and the California Subclass members' Internet communications exchanged with Defendant while accessing Defendant's Websites.

148. Defendant intentionally programmed, deployed, and maintained the Tracking Technologies on the Websites. The Tracking Technologies, including but not limited to JavaScript tags, cookies, web beacons, pixels, and software development kits, were embedded directly into the Websites' source code by Defendant and automatically execute within visitors' web browsers during the page-loading process.

149. Through these Tracking Technologies, Defendant facilitated the real-time interception and rerouting of Plaintiff's and the California Subclass members' communications, including full-string URLs revealing specific product pages viewed, search queries entered, browsing sequences, and product-configuration selections, to the servers of the Tracking Technologies' operators, including servers controlled by entities in China.

150. These interceptions occurred while Plaintiff's and the California Subclass members' communications were "in transit or passing over" a "wire, line, or cable" and were "being sent from, or received at" a "place within this state" within the meaning of Cal. Penal Code § 631(a). The Tracking Technologies fire simultaneously with and as part of the same HTTP request cycle as the user's communication with TP-Link's Websites.

151. Defendant assisted these interceptions without the requisite consent from Plaintiff and the California Subclass members.

152. The Tracking Technologies intended to learn, and did learn, the contents and meaning of the communications, including, without limitation, the full-string URLs, search queries, product pages viewed, browsing activity, and other content described herein, exchanged between the California Subclass members and Defendant

on Defendant's Websites.

153. For example, when Plaintiff visited tp-link.com to browse for equipment, the full-string URLs transmitted to the Tracking Technologies revealed the specific Devices and products Plaintiff was viewing (e.g., router models, mesh Wi-Fi systems, smart-home cameras), the specific product configurations Plaintiff was evaluating, and the specific searches Plaintiff entered on the Websites. These URLs disclose not merely that Plaintiff visited a networking-equipment retailer, but the precise devices, features, and price points Plaintiff was researching, information that reveals Plaintiff's purchasing intent, technological sophistication, home network configuration, and, by extension, the scope and security posture of Plaintiff's connected household.

154. The data intercepted and transmitted through the Tracking Technologies is not routine, anonymized, or aggregate website metrics. Each intercepted communication is linked—at the moment of transmission—to the specific user's persistent identifiers (IP address, cookie ID, device ID, advertising ID) such that the data is directly associated with an identified or identifiable individual. The combination of full-string URLs identifying the specific products researched, device configurations evaluated, and searches conducted with these persistent identifiers enables TP-Link and each Tracking Technology recipient to reconstruct a comprehensive, individualized profile of the user's home network needs, purchasing intentions, and technological environment. A reasonable California resident would not expect that her specific product-research sessions and home-network configuration choices would be transmitted in real time to the servers of Meta, Google, and entities affiliated with a foreign adversary.

155. When Plaintiff and the California Subclass members used TP-Link's mobile Applications, including TP-Link Tether, TP-Link Tapo, TP-Link Deco, and Kasa Smart, to configure and manage their networking and smart-home devices, TP-Link collected additional communications including IP addresses, MAC addresses, device identifiers, precise geolocation data, Wi-Fi credentials, and device log files,

and transmitted this data to third-party servers without the requisite consent.

156. Defendant, when aiding the Tracking Technologies to eavesdrop, intended those third parties to learn the content of the visitors' communications.

157. Defendant used, or attempted to use, information so obtained or, in the alternative, aided and assisted its Chinese-affiliated parent entities, subsidiaries, and facilities—including but not limited to TP-LINK Technologies Co., Ltd. and Lianzhou Technologies Co., Ltd.—in using or attempting to use information so obtained.

158. Specifically, Defendant used and continues to use the intercepted communications for the following purposes:

a. Behavioral Profiling and Targeted Advertising: Defendant used the intercepted communications and associated persistent identifiers to build detailed behavioral profiles of Plaintiff and the California Subclass members, track their activity across sessions, and deliver interest-based advertising—purposes expressly acknowledged in Defendant's Privacy Policy, which states that TP-Link uses personal information for "Marketing" and to "display interest-based ads for features, products, and services that might be of interest to you."

b. Transmission to Chinese-Affiliated Entities: TP-Link maintains at least four operational facilities in China—including its Shenzhen Research and Development Center, Shenzhen Manufacturing Center, Dongguan Manufacturing Center, and Shenzhen Guangqiao Manufacturing Center—and, on information and belief, transfers or provides access to intercepted user data to these facilities and associated Chinese entities, including TP-LINK Technologies Co., Ltd.

c. Third-Party Data Transmission via Devices and Router Firmware: TP-Link's router firmware has been found to transmit user network traffic data, including DNS queries, browsing activity, and Internet usage patterns without users' knowledge or adequate consent, even when all

related HomeShield features are disabled. This constitutes a separate and additional use of intercepted communications.

159. The following items constitute "machines, instruments, or contrivances" under CIPA, and, even if they do not, the tracking technology provided by the third parties falls within the broad catch-all category of "any other manner":

a. The computer codes and programs that the Tracking Technologies used to track Plaintiff's and the California Subclass members' communications while they navigated the Websites;

b. Plaintiff's and the California Subclass members' browsers;

c. Plaintiff's and the California Subclass members' computing and mobile devices;

d. The web and advertising servers of the Tracking Technologies;

e. The computer codes and programs that the Tracking Technologies used to track and intercept Plaintiff's and the California Subclass members' communications while they were using a browser to visit Defendant's Websites;

f. TP-Link's Devices and router firmware and the embedded code therein that transmits user network traffic data to Avira SafeThings and other third-party servers; and

g. TP-Link's mobile Applications—including TP-Link Tether, TP-Link Tapo, TP-Link Deco, and Kasa Smart—and the embedded SDKs, APIs, and tracking code therein that collect and transmit user communications and device-level data to third-party servers.

160. The tracking and interception of Plaintiff's and the California Subclass members' communications while they were using a web browser or mobile Application to visit Defendant's Websites originated in, and was executed in, California.

161. Plaintiff and the California Subclass members did not consent to the

interception, reading, learning, or use of their communications by the Tracking Technologies or TP-Link's Chinese-affiliated entities.

162. TP-Link's Privacy Policy and Cookie Policy do not constitute valid consent because: (i) they do not specifically identify each third-party recipient of intercepted data; (ii) they do not disclose the scope of data intercepted; (iii) they categorize numerous cookies and tracking technologies with descriptions marked only as "Unknown"; (iv) they do not disclose that user data is transmitted to entities subject to the jurisdictional control of China; (v) at the point of purchase, TP-Link's checkout page—powered by Shopify's e-commerce platform—only prominently presented Plaintiff and California Purchaser Subclass members with Shopify's standard terms of service; and (vi) the Tether app's onboarding flow, during which Plaintiff entered her home Wi-Fi credentials and configured her extenders, presented no privacy disclosure, consent mechanism, or opt-out opportunity contemporaneous with the collection of those credentials.

163. As a direct and proximate result of Defendant's violations of California Penal Code § 631, Plaintiff and the California Subclass members have suffered harm, including the invasion of their statutory privacy rights, the violation of the confidentiality and protection afforded by the BSDR, and the loss of control over their sensitive personal information and private communications.

164. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiff and the California Subclass members have a reasonable fear that their private communications will continue to be unlawfully intercepted, read, learned, and used if they visit the Websites, use TP-Link's mobile Applications, or operate TP-Link's networking and smart-home devices.

165. Pursuant to California Penal Code § 637.2, Plaintiff and the California Subclass members have been injured by the violation of California Penal Code § 631 and each seek damages for the greater of $5,000 or three times the actual amount of damages, as well as injunctive relief.

**THIRD CAUSE OF ACTION**
**Violation of the Consumers Legal Remedies Act,**
**Cal. Civ. Code § 1750, *et seq.*;**
***(On Behalf of Plaintiff and the California Purchaser Subclass)***

166. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as fully set forth herein.

167. The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices…undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

168. TP-Link is a "person" within the meaning of the CLRA. *See* Cal. Civ. Code § 1761(c).

169. Plaintiff and the California Purchaser Subclass members are "consumers" within the meaning of the CLRA because they purchased TP-Link's goods and services for personal, family, or household purposes. *See* Cal. Civ. Code § 1761(d).

170. TP-Link's sale of networking devices, mesh Wi-Fi systems, smart-home cameras, and related products and services to Plaintiff and the California Purchaser Subclass members is an "agreement between a consumer and another person" and is therefore a "transaction" within the meaning of the CLRA. *See* Cal. Civ. Code § 1761(e).

171. In connection with the sale of its products and services to Plaintiff and the California Purchaser Subclass members, Defendant engaged in unfair and deceptive acts and practices in violation of California Civil Code § 1770(a), including the following:

a. Representing that goods have characteristics, uses, or benefits which they do not have, in violation of § 1770(a)(5): Defendant falsely represented that its networking devices protect consumers' privacy and security, without acknowledging such known vulnerabilities as the numerous

firmware vulnerabilities exploited by Chinese state-sponsored hacking groups, the Devices' firmware transmits user network traffic data to third-party servers without consent even when all security features are disabled, and TP-Link's Tracking Technologies surreptitiously intercept and transmit users' personal data to entities affiliated with China.

b. Representing that goods are of a particular standard, quality, or grade when they are not (Cal. Civ. Code § 1770(a)(7)): Defendant represented that its products meet a standard of privacy, security, and American manufacture that they do not meet. TP-Link affixed "Made in Vietnam" stickers to its products sold at retail locations throughout California, falsely representing that its devices are manufactured independently of Chinese operations.

c. Advertising goods with intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)): Defendant advertised its products as secure, privacy-protecting networking devices with no ties to China, while intending at all times to deploy the Tracking Technologies on the Websites and within the Applications and Devices to intercept, collect, and transmit consumers' personal data to third parties and to entities affiliated with China, in violation of the BSDR and applicable privacy laws.

d. Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve (Cal. Civ. Code § 1770(a)(14)): TP-Link's representations to consumers, including its privacy policies, failed to disclose: (i) the specific Tracking Technologies deployed and the identity of each third-party recipient; (ii) that user data is transmitted to entities subject to the jurisdictional control of China; (iii) that TP-Link's Chinese affiliations subject consumers' data to compelled disclosure under PRC national intelligence laws; and (iv) that the Devices' firmware transmits user network traffic data to third-party

servers without any consent mechanism, even when all related HomeShield/HomeCare features are disabled.

e. Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal Civ. Code § 1770(a)(16)): Whereas Defendant represented that its ownership and manufacturing were independent of Chinese operations, TP-Link Systems Inc.'s CEO Jeffrey Chao continues to own and manage Chinese subsidiaries and facilities. The company has also imported over 49 shipments of devices from its Chinese-affiliated companies as recently as January 2026, and TP-Link's supply chain remains entrenched in China.

172. Defendant's misrepresentations and omissions were material because a reasonable consumer would consider them important in deciding whether to purchase TP-Link's products or services. Had Plaintiff and the California Purchaser Subclass members known the truth—that TP-Link's devices are deeply entangled with Chinese operations, that they contain firmware vulnerabilities exploited by Chinese state-sponsored hackers, that their personal data would be surreptitiously collected and transmitted to entities subject to PRC intelligence-access obligations, and that TP-Link's claimed corporate separation from its Chinese parent was illusory—they would not have purchased TP-Link's products, or would have paid substantially less for them.

173. Plaintiff and the California Purchaser Subclass members relied on Defendant's misrepresentations and omissions in deciding to purchase TP-Link products. Defendant's misrepresentations and omissions were made in marketing materials, product packaging, the Websites, and in TP-Link's Privacy Policy and Cookie Policy, all of which were designed to, and did, induce consumers to purchase Defendant's products.

174. Plaintiff and the California Purchaser Subclass members relied on

specific, identified representations made by Defendant in deciding to purchase TP-Link products. Specifically, before completing her July 2025 purchase, Plaintiff:

a. visited TP-Link's Website, www.tp-link.com, and reviewed product pages for TP-Link extender models that prominently featured TP-Link's HomeShield security marketing, including representations that HomeShield "covers all security scenarios," provides "100% safeguard for network security," and ensures that "your devices and personal information are well protected anytime and anywhere with antivirus, online threat protection, firewall, secure VPN client, and privacy monitor";

b. reviewed product descriptions on the Website that represented TP-Link's extenders as "secure" networking devices designed to protect the user's home network;

c. encountered packaging and product materials representing that TP-Link's devices were "Made in Vietnam," which she reasonably understood to mean that the devices were manufactured outside of China and were not subject to Chinese government oversight or intelligence-access obligations;

d. reviewed TP-Link's stated commitment to "protect your privacy," as represented in the product descriptions and Website marketing materials she reviewed prior to purchase; and

e. was not presented with, and did not receive, any disclosure on the checkout page indicating that her personal data would be transmitted to entities subject to PRC intelligence-access obligations, or that TP-Link's Chinese affiliations subjected her data to compelled disclosure under China's National Intelligence Law.

175. Each of these representations was false or misleading in the specific respects alleged herein, TP-Link's HomeShield security representations were false

because TP-Link's devices contained firmware vulnerabilities exploited by Chinese state-sponsored hackers; the "Made in Vietnam" representation was false because the vast majority of components were imported from China; and TP-Link's privacy assurances were false because TP-Link's Tracking Technologies and Device firmware transmitted Plaintiff's data to entities affiliated with a foreign adversary. Plaintiff would not have purchased TP-Link's products, or would have paid substantially less for them, had Defendant made truthful disclosures.

176. TP-Link's security and privacy representations are not mere peripheral marketing puffery—they relate to the central functionality of the products at issue. TP-Link's extenders and router products are, by their nature, security and networking devices whose core value proposition is to provide secure, private Internet connectivity in the consumer's home. The security and privacy representations TP-Link made (HomeShield, "protect your personal information," "100% safeguard for network security") went directly to whether the product functioned as the type of product it purported to be.

177. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiff and the California Purchaser Subclass members have suffered injury-in-fact, including (i) the loss of money paid to purchase TP-Link products they would not otherwise have purchased, or would have purchased at a lower price, had they known the truth; (ii) the diminution in value of products that do not possess the privacy, security, and manufacturing characteristics that were represented; and (iii) the loss of valuable personal data that was surreptitiously collected and transmitted to third parties and to entities affiliated with a foreign adversary.

178. Plaintiff, individually and on behalf of the California Purchaser Subclass members, has complied with California Civil Code § 1782 by providing Defendant with notice and a demand for corrective action at least thirty days before adding claims for monetary damages.

179. Pursuant to California Civil Code §§ 1780 and 1782, Plaintiff, on behalf

of herself and the California Purchaser Subclass members, seeks: an order enjoining Defendant from continuing to engage in the unfair and deceptive acts and practices alleged herein, including an order requiring Defendant to: (i) cease misrepresenting its Chinese affiliations, the country of origin of its products, and the privacy and security capabilities of its Devices; (ii) cease the surreptitious interception, collection, and transmission of consumers' personal data to entities affiliated with countries of concern under the BSDR; and (iii) implement truthful and adequate disclosures identifying the third-party recipients of user data, the scope of data collected, and the fact that user data flows to entities subject to PRC intelligence-access obligations.

180. Under the CLRA, Plaintiff and the Subclass are entitled to: (1) actual damages, including restitution of the price premium attributable to TP-Link's concealment and misrepresentation; (2) an order enjoining TP-Link from continuing the unlawful practices described herein; (3) punitive damages upon a showing that TP-Link's conduct was malicious, oppressive, or fraudulent; and (4) reasonable attorneys' fees and costs of suit.

**FOURTH CAUSE OF ACTION**
**Violation Of Cal. Const. Art. 1 § 1**
**Invasion of Privacy**
***(On Behalf of Plaintiff and the California Subclass)***

181. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as fully set forth herein.

182. Plaintiff's and the California Subclass members' expectation of privacy is deeply enshrined in California's Constitution.

183. Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

184. The right to privacy was added to Article I, section 1 by the voters' approval of Proposition 11 in November 1972. The argument in favor of Proposition

11 reveals the legislative intent was to curb business control over unauthorized collection and use of consumers' personal information:

> The right of privacy is the right to be left alone . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

185. Plaintiff and the California Subclass members have a legally protected interest in preventing the unauthorized collection, aggregation, and dissemination of their personal information, particularly when this data reflects sensitive aspects of their personal lives.

186. Plaintiff and the California Subclass members also have a strong interest in preventing the widespread distribution of detailed behavioral profiles to unknown third parties, including foreign entities subject to the jurisdictional control of China, without their knowledge or consent.

187. Plaintiff and the California Subclass members maintain a reasonable expectation of privacy in their day-to-day lives, including in their Internet browsing activity, online communications, home network traffic, device configurations, and the personal data that Defendant surreptitiously collects, enriches, and shares with countries of concern without the knowledge or consent of Plaintiff and the California Subclass members.

188. Specifically, Plaintiff and the California Subclass members have legally protected privacy interests in: the content of their Internet browsing activity; their home network traffic; their device configuration data; their geolocation data; their persistent identifiers; and their communications with TP-Link's Websites, Applications, and Devices.

189. No reasonable consumer would expect that purchasing a Wi-Fi router, mesh system, or smart-home device—or downloading a mobile application to manage

such a device, would result in the surreptitious collection, aggregation, and foreign transmission of their browsing activity, network traffic, device credentials, geolocation data, and persistent identifiers to entities affiliated with China.

190. TP-Link represented to consumers that its products protect their privacy and security. TP-Link marketed its HomeShield service as covering "all security scenarios," providing "100% safeguard for network security," handling "all concerns regarding cyber virus intrusions and IoT device attacks," and "protect[ing] all your IoT and other connected devices from any cyber threats and attacks." Consumers who purchased TP-Link Devices in reliance on these representations reasonably believed that their data not be harvested and transmitted to entities subject to PRC intelligence-access obligations.

191. TP-Link further reinforced this expectation by representing that its products are manufactured in Vietnam with no ties to China, including by affixing "Made in Vietnam" stickers to its products sold at retail locations throughout California. Consumers who relied on these representations reasonably believed that their data would not flow to Chinese-affiliated entities.

192. As the Texas Attorney General has alleged, these representations are "false, misleading, and deceptive" because TP-Link maintains at least four major manufacturing and R&D facilities in mainland China, components sourced from Vietnam account for less than 1% of device components, and TP-Link's CEO Jeffrey Chao continues to own and manage Chinese subsidiaries.

193. Defendant invades these interests, in violation of Plaintiff's and the California Subclass members' reasonable expectation of privacy, through its covert collection, aggregation, correlation, and dissemination of sensitive information and persistent identifiers tied to Plaintiff and the California Subclass members as alleged.

194. Defendant intentionally and extensively violates the reasonable expectation of privacy held by Plaintiff and the California Subclass members through engaging in this covert, large-scale data collection, designed to uniquely identify and

surveil individuals.

195. Specifically, Defendant collects, aggregates, and disseminates Plaintiff's and the California Subclass members' personal information through three independent methods, Website based collection, Application based collection, and Device based collection as detailed above.

196. This extensive covert surveillance and targeting would be highly offensive to a reasonable person and constitutes an egregious breach of social norms.

197. TP-Link's conduct satisfies the "highly offensive" and "egregious breach of social norms" standards for the following specific reasons, which distinguish this case from routine website-tracking disputes involving only advertising pixels:

a. Intrusion Through a Device in the Home: TP-Link's data collection occurs not merely through a website visited in a public digital space, but through hardware devices—routers and mesh Wi-Fi systems—that are physically installed in consumers' private residences. The California Supreme Court has distinguished between uninvited physical incursions into private spaces and remote observations of public conduct.

b. Home Network Architecture and Credentials: The data collected through TP-Link's Applications includes Wi-Fi network names and passwords—the literal keys to the consumer's home network—as well as the MAC addresses of every device connected to that network, device log files disclosing household occupancy patterns, and precise geolocation data identifying the physical location of the consumer's home. No reasonable person would consider the collection and transmission of their home network credentials to a foreign adversary to be a non-offensive, routine commercial data practice.

c. Transmission to a Foreign Intelligence Service: TP-Link's data flows to entities subject to the compulsory jurisdiction of China's 2017 National Intelligence Law, which mandates that all PRC companies "support,

assist, and cooperate with PRC intelligence efforts." A reasonable person would find it highly offensive to discover that their home network credentials and browsing history were transmitted to entities that are legally required to share that data with a foreign intelligence service upon demand.

d. The Router as a Surveillance Vector: TP-Link marketed its devices as home security products. Consumers purchased them specifically to protect their home networks and digital lives. The use of a device sold as a security tool to surveil the consumer and transmit that surveillance to a foreign adversary—without disclosure, without consent, and in violation of federal law—constitutes precisely the type of egregious, trust-betraying conduct that California's constitutional privacy protection was enacted to address.

198. Secretly collecting such data in sensitive contexts is highly offensive. Plaintiff and the California Subclass members purchased TP-Link's Devices to secure their homes and businesses. The data collected spans every dimension of the consumer's digital life: the products they research, the websites they visit, the searches they enter, the credentials they submit, the network traffic they generate, and their precise physical locations.

199. Correlating that information into detailed user profiles is highly offensive. Through the Tracking Technologies, the Applications' tracking code, and the Devices' firmware, Defendant does not merely collect isolated data points from Plaintiff and the California Subclass members. Defendant's extensive use of identifying cookies, device IDs, and advertising identifiers enables the linkage of user identifiers across sessions, platforms, and time, allowing Defendant to build detailed, persistent profiles reflecting each individual's behavior, preferences, purchasing intent, home network architecture, and location patterns.

200. Committing criminal and tortious acts against millions of Americans

constitutes an egregious breach of social norms that is highly offensive. Defendant's conduct violates the ECPA, CIPA §§ 631, and the BSDR, all of which are designed to protect the very privacy interests that Defendant has invaded. The systematic violation of these laws, on a mass scale, against consumers who trusted TP-Link to protect their digital lives, compounds the offensiveness of Defendant's invasion.

201. As a result of these extensive and intentional invasions of privacy, Plaintiff and the California Subclass members have suffered harm, including the violation of their inalienable constitutional right to privacy; the unauthorized collection, aggregation, correlation, and dissemination of their sensitive personal information; the loss of control over the circulation of their personal information; the exposure of their behavioral data to entities affiliated with a foreign adversary, subjecting them to heightened risks of surveillance, profiling, and targeting; and economic harm, in that they would not have purchased TP-Link's Devices, downloaded TP-Link's Applications, or used TP-Link's Websites had they known of Defendant's true data-collection and foreign-transfer practices.

202. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiff and the California Subclass members have a reasonable fear that their personal information will continue to be unlawfully collected, aggregated, and disseminated if they use the Websites, the Applications, or the Devices.

203. Plaintiff and the California Subclass members are entitled to compensation, including general damages, special damages, and nominal damages, as well as injunctive relief prohibiting Defendant from continuing its unlawful invasion of their constitutional right to privacy.

## FIFTH CAUSE OF ACTION
## Intrusion Upon Seclusion
***(On Behalf of Plaintiff and the California Subclass)***

204. Plaintiff repeats and re-alleges all factual allegations contained in the

foregoing paragraphs as fully set forth herein.

205. Under California common law, intrusion upon seclusion is established where a defendant (1) intentionally intrudes into a private place, conversation, or matter (2) in a manner highly offensive to a reasonable person. *Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200, 231 (1998); Restatement (Second) of Torts § 652B (1977).

206. The tort does not require publication of the information obtained; the intrusion itself is the wrong. *Id.* at 231. The tort protects the right to be free from unreasonable, uninvited intrusions into one's private affairs, regardless of the intruder's ultimate use of the information obtained.

207. TP-Link has violated Plaintiff's and the California Subclass members' reasonable expectation of privacy through its collection, aggregation, correlation, and dissemination of Plaintiff's and the California Subclass members' personal information.

208. TP-Link's practices are highly offensive to a reasonable person for the specific reasons set forth in the preceding Cause of Action and incorporated herein, including: (i) the collection of home network credentials, device log files, and network architecture data from within consumers' private residences; (ii) the transmission of that data to entities subject to Chinese intelligence-access obligations; (iii) the use of a home security device as the vector for that surveillance; and (iv) the absence of meaningful notice or consent.

209. TP-Link collects home network credentials, DNS queries revealing the full scope of a consumer's private Internet usage, device log files disclosing the occupancy patterns of a private residence, and precise geolocation data identifying the physical location of the consumer's home—all from within the consumer's private residence, through a device the consumer purchased for the purpose of security and privacy.

210. Through TP-Link's multi-vector data collection of Website Tracking

Technologies, Application-level credential collection, and firmware-level network-traffic surveillance, Plaintiff's data from her private residence was collected and directed to entities affiliated with a foreign adversary.

211. No reasonable user purchasing a home networking device would expect device manufacturer to: (i) collect home Wi-Fi credentials; (ii) transmit DNS queries and browsing patterns to third-party servers through undisclosed firmware processes; (iii) intercept Website browsing through advertising pixels that reroute communications to Meta, Google, and Chinese-affiliated entities; and (iv) channel data to entities subject to PRC intelligence-access obligations.

212. Even if Defendant could articulate some business interest, that interest is vastly outweighed by the severity of the intrusion, particularly given: (i) the scope and intimacy of the data collected (spanning browsing activity, network traffic, device credentials, geolocation, and home network architecture); (ii) the fact that the data is collected through the very devices consumers purchased to secure their homes; (iii) the flow of data to entities subject to PRC intelligence-access obligations; and (iv) Defendant's affirmative misrepresentations that its products protect consumers' privacy and security and have no ties to China.

213. As a result of these extensive and intentional intrusions upon Plaintiff's and the California Subclass members' seclusion, Plaintiff and the California Subclass members have suffered harm, including the violation of their right to be free from unreasonable intrusion into their private affairs; the unauthorized collection, aggregation, correlation, and dissemination of their sensitive personal information from within their homes and private digital spaces; the creation and dissemination of highly detailed identity profiles, enriched by the contents of their intercepted communications and network traffic, without their knowledge or consent; the exposure of their behavioral data to entities affiliated with a foreign adversary, subjecting them to heightened risks of surveillance, profiling, and targeting; and economic harm, in that they would not have purchased TP-Link's Devices, downloaded TP-Link's

Applications, or used TP-Link's Websites had they known of Defendant's true data-collection and foreign-transfer practices.

214. As a result of these extensive and intentional invasions of privacy, Plaintiff and the California Subclass members are entitled to just compensation and injunctive relief.

215. Plaintiff and the California Subclass members are also entitled to punitive damages because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice within the meaning of California Civil Code § 3294. Defendant acted with conscious disregard of Plaintiff's and the California Subclass members' rights by deliberately concealing the scope of its data collection, by affirmatively misrepresenting the security and origin of its products, and by continuing its invasive practices even after being put on notice of the firmware vulnerabilities and national-security risks associated with its devices.

216. Unless enjoined and restrained by this Court, Defendant will continue to commit these intrusions. Plaintiff and the California Subclass members have a reasonable fear that their seclusion will continue to be unlawfully intruded upon if they use the Websites, the Applications, or the Devices.

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment**
***(On Behalf of Plaintiff and the California Purchaser Subclass)***

217. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as fully set forth herein.

218. As used in this Cause of Action, references to the "Class" and "Class members" refer to Plaintiff and the members of the California Purchaser Subclass.

219. This cause of action is pleaded in the alternative.

220. Defendant has been unjustly enriched at the expense of Plaintiff and Class members through its unauthorized collection, use, and monetization of their personal data.

221. Plaintiff and Class members conferred a benefit upon Defendant by

providing valuable information through their use of TP-Link's Websites, their use of TP-Link's Applications, and their operation of TP-Link's Devices.

222. Such sensitive information commands exceptional value due to its predictive power and marketing utility. The personal data conferred upon Defendant includes Website Data; Application Data; Device Data; and Behavioral Profiles.

223. Defendant received and retained this benefit by intercepting, collecting, and transmitting Plaintiff's and Class members' sensitive personal data, through the Tracking Technologies embedded in the Websites, the tracking code embedded in the Applications, and the firmware code embedded in the Devices, to third parties and to Defendant's Chinese-affiliated entities, without authorization or consent.

224. Defendant derives commercial value from sharing users' information with third parties for marketing analytics, behavioral targeting, and user profiling purposes. The Tracking Technologies deployed on the Websites generate revenue for Defendant through advertising partnerships, programmatic ad placement, and data-sharing arrangements that are funded by the value of users' personal data.

225. Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable data. By surreptitiously collecting users' personal information without meaningful disclosure, Defendant circumvented the costs that competitors who comply with applicable privacy laws, including the BSDR's security requirements for restricted transactions, the CISA Security Requirements, and state and federal consent requirements, must bear.

226. The unauthorized collection of comprehensive user data increases the overall value and effectiveness of Defendant's platform, its advertising partnerships, and, given TP-Link's deep and continuing ties to China, the PRC's surveillance apparatus. TP-Link's Chinese-affiliated entities, including TP-LINK Technologies Co., Ltd. and Lianzhou Technologies Co., Ltd., derive value from access to American consumers' behavioral data, which can be used for profiling, market intelligence, and,

as the Texas Attorney General has alleged, to support PRC intelligence efforts.

227. Defendant obtained this benefit through the unlawful interception, recording, and unauthorized disclosure of Plaintiff's and Class members' personal information, in violation of, *inter alia*, the ECPA (18 U.S.C. § 2510, *et seq.*), CIPA (Cal. Penal Code §§ 631), and the BSDR (28 C.F.R. Part 202).

228. But for these unlawful acts and deceptive practices, Plaintiff and Class members would not have purchased TP-Link's Devices, downloaded TP-Link's Applications, or used TP-Link's Websites, and therefore would not have conferred the valuable personal data that Defendant has monetized.

229. Plaintiff and Class members have no adequate remedy at law for the full measure of Defendant's unjust enrichment for the following specific reasons:

a. Statutory damages under the ECPA (18 U.S.C. § 2520(c)(2)) are set at $100 per day of violation or $10,000 per plaintiff, whichever is greater—floor amounts that are not calibrated to the economic value of the data TP-Link wrongfully extracted from each class member or the revenue TP-Link derived from monetizing that data through advertising partnerships and data-sharing arrangements with third parties and Chinese-affiliated entities.

b. Statutory damages under CIPA (Cal. Penal Code § 637.2) are set at $5,000 per violation—a fixed per-violation amount that does not capture the fair market value of the behavioral data, home network credentials, and usage profiles that TP-Link extracted and transmitted to entities affiliated with a foreign adversary.

c. The value of the personal data TP-Link wrongfully extracted is not a readily quantifiable damages figure recoverable through any of the legal claims asserted herein. The enrichment TP-Link obtained includes: (i) the advertising revenue and data-partnership value derived from the behavioral profiles built from class members' intercepted data; (ii) the

value TP-Link's Chinese-affiliated entities derived from access to American consumers' home network architecture, credentials, and usage patterns; and (iii) the costs TP-Link avoided by not implementing lawful consent mechanisms, adequate privacy disclosures, and the security requirements mandated by the BSDR for restricted data transactions.

d. None of these benefits is fully recoverable through compensatory or statutory damages at law; equity requires that TP-Link disgorge the profits and avoided costs it derived from this unlawful conduct.

230. Plaintiff and Class members have no adequate remedy at law for Defendant's Unjust Enrichment, as they cannot recover the specific value of their appropriated data through traditional damages calculations.

231. The value of personal data is inherently difficult to quantify because it derives from the aggregation, correlation, and contextual enrichment of information across individuals and over time. The harm to Plaintiff and Class members is not limited to the loss of identifiable monetary value but extends to the loss of autonomy, privacy, and control over the circulation of their personal information, interests that are not adequately compensated through conventional damages.

232. Plaintiff and Class members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their sensitive information.

233. Plaintiff and Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant TP-Link Systems, Inc. and award the following relief:

A. An order certifying this case as a class action pursuant to Rule 23(b)(2)

and Rule 23(b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. The greater of: (a) the sum of actual damages suffered by Plaintiff and the Nationwide Class members and disgorgement of Defendant's profits obtained as a result of its unlawful conduct; or (b) statutory damages as authorized by 18 U.S.C. § 2520(c)(2);

C. Punitive damages as authorized by 18 U.S.C. § 2520(b)(2);

D. The greater of $5,000 or three times the amount of actual damages sustained by Plaintiff and the California Subclass members, pursuant to California Penal Code § 637.2;

E. Actual damages suffered by Plaintiff and the California Subclass members as a result of Defendant's violations of the CLRA;

F. Restitution of all amounts wrongfully obtained by Defendant pursuant to California Civil Code § 1780;

G. Punitive damages as authorized by Cal. Civil Code § 1780(a)(4);

H. General, special, and nominal damages in an amount to be proven at trial;

I. Compensatory damages in an amount to be proven at trial;

J. Punitive damages pursuant to Cal. Civil Code § 3294;

K. An order permanently enjoining Defendant from continuing to engage in the unlawful acts and practices alleged herein, including the unlawful interception, recording, and unauthorized transmission of consumers' personal data to entities affiliated with countries of concern under the BSDR, and from misrepresenting its Chinese affiliations, the country of origin of its products, and the privacy and security capabilities of its Devices;

L. Pre-judgment and post-judgment interest as provided by law;

M. Reasonable attorneys' fees and costs of suit; and

N. Such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff, individually and on behalf of all others similarly situated, hereby demands a trial by jury of all claims and issues so triable.

DATED: July 15, 2026

*/s/ Britany A. Wessan*

Britany A. Wessan*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel: (708) 529-5418
Britany@almeidalawgroup.com

Victor Sandoval
(CA Bar Number: 344461)
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd., Suite 426
Long Beach, California 90802
Tel: (310) 896-5813
Victor@almeidalawgroup.com

Heather M. Lopez (SBN 354022)
**Milberg PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel: (331) 240-3015
Email: hlopez@milberg.com

Attorneys for Plaintiff and the Putative Classes

* *Pro Hac Vice*